**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OSMAN ALFREDO AGUILAR-OSORIO,
*Petitioner*,

v.

MERRICK B. GARLAND, Attorney
General,
*Respondent*.

No. 19-73000

Agency No.
A079-034-571

OPINION

On Petition for Review of an Order of the
Board of Immigration Appeals

Submitted September 14, 2020[*]
San Francisco, California

Filed March 15, 2021

Before: Mary M. Schroeder, William A. Fletcher, and
Lawrence VanDyke, Circuit Judges.

Per Curiam Opinion;
Dissent by Judge VanDyke

---

[*] The panel unanimously concludes this case is suitable for decision
without oral argument. *See* Fed. R. App. P. 34(a)(2).

## SUMMARY**

### Immigration

The panel granted in part, dismissed in part, and denied in part, Osman Alfredo Aguilar-Osorio's petition for review of the Board of Immigration Appeals' denial of his motion to terminate or remand proceedings, and his application for withholding of removal and protection under the Convention Against Torture, and remanded.

The panel rejected as foreclosed by circuit precedent Aguilar-Osorio's argument that jurisdiction never vested with the immigration judge because his Notice to Appear did not include the date and time of his hearing. The panel concluded that it lacked jurisdiction to consider Aguilar-Osorio's argument, raised for the first time to this court, that he never received his Notice of Hearing.

Because the court lacks jurisdiction to review the merits of the Board's discretionary decision to deny cancellation of removal based on hardship, the panel concluded that it lacked jurisdiction to consider the Board's denial of Aguilar-Osorio's motion to remand to seek cancellation of removal based on the alleged "exceptional and extremely unusual hardship" his removal would cause his mother, a legal permanent resident. Noting that Aguilar-Osorio argued that this court had jurisdiction to review whether the Board violated his due process rights by failing to consider the relevant evidence, the panel concluded that there was

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

nothing in the record to indicate that there was relevant evidence the Board failed to consider in making its hardship decision.

Regarding Aguilar-Osorio's petition for withholding of removal, the panel agreed with the Board that Aguilar-Osorio's proposed social group comprised of "witnesses who … could testify against gang members based upon what they witnessed" was not "discrete" and lacked "definable boundaries." The panel also concluded that, unlike the particular social group of Salvadoran witnesses who testified in open court against gang members that the court deemed cognizable in *Henriquez-Rivas v. Holder*, 707 F.3d 1081 (9th Cir. 2013), Aguilar-Osorio failed to show that his proposed group was socially recognizable and distinct. Because Aguilar-Osorio failed to establish membership in a cognizable social group, the panel held that he was ineligible for withholding of removal.

With respect to CAT, the panel held that substantial evidence supported the Board's determination that Aguilar-Osorio failed to establish that past torture occurred with the consent or acquiescence of a public official as required by 8 C.F.R. § 1208.18(a)(1), where his testimony indicated that the police never learned about harm he suffered as a result of his witnessing a robbery and receiving a subsequent threat.

Aguilar-Osorio's fear of future torture was based on a State Department's Country Report describing pervasive criminality within Honduran society. The panel observed that although the IJ declined to receive the Report as an official part of the record because the form in which it was offered did not comply with the rules, the IJ's decision treated it as part of the record by taking judicial notice of it.

The panel further observed that Aguilar-Osorio relied upon the Report in his appeal to the Board, yet the Board's decision neither took the Report into account nor explained why it was not taking it into account. The panel concluded that it therefore did not have an adequate basis on which to evaluate Aguilar-Osorio's claim of future torture that was based, in part, upon the Report. The panel noted that it could not independently take judicial notice of a report that was not a part of the record. The panel wrote that the question of how to treat this unusual situation was an issue the Board had not addressed and that the panel therefore could not decide in the first instance. The panel remanded Aguilar-Osorio's CAT claim to the Board for reconsideration in light of the fact that the IJ took judicial notice of, and relied upon, the Country Report.

Dissenting, Judge VanDyke wrote that the majority's lawless remand of this case to the Board flouted binding precedent stating that the Board is not required to consider—nor is this court permitted "to take judicial notice of"—a Country Report that is "not part of the administrative record or not previously submitted to the Board." Judge VanDyke wrote that the Board did not err in this case. Rather, it acted in accordance with court precedents. Nevertheless, the court once again remanded without clear direction or even a clear description of what the Board apparently did wrong. Judge VanDyke would have denied the petition in full.

## COUNSEL

Christopher J. Stender, Federal Immigration Counselors, AZ, PC, Phoenix, Arizona, for Petitioner.

Robbin K. Blaya, Trial Attorney; Joseph H. Hunt, Assistant Attorney General; John S. Hogan, Assistant Director; Office of Immigration Litigation, Civil Division, United States Department of Justice, Washington, D.C.; for Respondent.

## OPINION

PER CURIAM:

Osman Alfredo Aguilar-Osorio, a Honduran citizen, seeks review of the Board of Immigration Appeals' (BIA) denial of his motion to terminate or remand proceedings, as well as his applications for withholding of removal and protection under the Convention Against Torture (CAT). We have jurisdiction pursuant to 8 U.S.C. § 1252. We grant the petition on the basis of an evidentiary issue with respect to the CAT claim and otherwise deny the petition.

1. Aguilar-Osorio argues, for the first time to this court, that because he never received his 2001 notice of hearing, jurisdiction never vested in the immigration court and his removal proceedings should thus be terminated. But because Aguilar-Osorio failed to present this argument to both the immigration judge (IJ) and the BIA, we lack jurisdiction to consider it. 8 U.S.C. § 1252(d)(1); *Barron v. Ashcroft*, 358 F.3d 674, 677 (9th Cir. 2004); *Samayoa-Martinez v. Holder*, 558 F.3d 897, 902 n.7 (9th Cir. 2009); *Ochave v. I.N.S.*, 254 F.3d 859, 867 (9th Cir. 2001).[1]

---

[1] Notably, Aguilar-Osorio did raise this argument in his motion to reopen his absentia removal order, which the IJ granted. In his reopened proceedings, Aguilar-Osorio admitted the 2001 NTA's factual allegations and removability charge and has been given a full opportunity to seek all the relief for which he is not time-barred.

Precedent squarely forecloses the termination argument that Aguilar-Osorio actually presented to the BIA—that jurisdiction never vested in the IJ because the 2001 NTA did not include his hearing date and time. *See Karingithi v. Whitaker*, 913 F.3d 1158, 1160 (9th Cir. 2019); *Aguilar Fermin v. Barr*, 958 F.3d 887, 893 (9th Cir. 2020).

2.   The BIA also denied Aguilar-Osorio's motion to remand to seek cancellation of removal based on the alleged "exceptional and extremely unusual hardship" his removal would cause his mother, a legal permanent resident. 8 U.S.C. § 1229b(b)(1)(D).  This court does not have jurisdiction to review the merits of the BIA's discretionary decision to deny cancellation of removal based on hardship. *See Martinez-Rosas v. Gonzales*, 424 F.3d 926, 930 (9th Cir. 2005). Aguilar-Osorio argues that we have jurisdiction to review whether the BIA violated his due process rights by failing to consider the relevant evidence and should remand on that basis.  There is nothing in the record to indicate that there was relevant evidence that the BIA failed to consider in making its hardship decision.

3.   Regarding Aguilar-Osorio's petition for withholding of removal, both the BIA and IJ concluded that his proposed particular social group (PSG) was not cognizable.   We review de novo and agree. *See Mendoza-Alvarez v. Holder*, 714 F.3d 1161, 1163 (9th Cir. 2013).  As the BIA noted, Aguilar-Osorio's proposed group, "witnesses who … could testify against gang members based upon what they witnessed," encompasses "anyone in Honduras who is a potential witness to anything that can be characterized as crime committed by a gang member."  As such, the proposed group is not "discrete" and lacks "definable boundaries." *Matter of M-E-V-G-*, 26 I. & N. Dec. 227, 239 (BIA 2014)

(citing *Ochoa v. Gonzales*, 406 F.3d 1166, 1171 (9th Cir. 2005)).

Unlike the PSG of Salvadoran witnesses who testified in open court against gang members that we deemed cognizable in *Henriquez-Rivas v. Holder*, 707 F.3d 1081, 1092 (9th Cir. 2013), Aguilar-Osorio has not shown that his proposed group is socially recognizable and distinct. *Id*. at 1093.[2]  Aguilar-Osorio failed to establish membership in a cognizable social group and is therefore ineligible for withholding of removal under 8 U.S.C. § 1231(b)(3).

4.  With respect to CAT, substantial evidence supports the BIA's determination that Aguilar-Osorio failed to establish that past torture occurred with the consent or acquiescence of a public official as required by 8 C.F.R. § 1208.18(a)(1). His testimony indicated that the police never learned about harm he suffered as a result of his witnessing a robbery and receiving a subsequent threat.

He further argues, however, that he faces the threat of future torture, pointing to the State Department's Country Report that describes pervasive criminality within Honduran society. Although the IJ declined to receive the Report as an official part of the record because the form in which it was offered did not comply with the rules, the IJ's decision treated it as part of the record by taking judicial notice of it. Aguilar-Osorio has relied upon the Report in his appeal to the BIA and in his brief to this court. Yet the BIA decision neither took the Report into account nor explained why it was not taking it into account. We therefore do not have an adequate basis on which to evaluate Aguilar-Osorio's claim

---

[2] We lack jurisdiction to address Aguilar-Osorio's alternative PSG that he raised here for the first time. *See Barron*, 358 F.3d at 677.

of future torture that is based, in part, upon the Report.  We cannot independently take judicial notice of a report that is not a part of the record.  *Fisher v. INS*, 79 F.3d 955, 963 (9th Cir. 1996).

The question of how to treat this unusual situation is an issue that the BIA has not addressed and therefore we cannot decide in the first instance.  *See INS v. Ventura*, 537 U.S. 12, 16 (2002) (citations omitted) ("[T]he proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.").  We therefore remand the CAT claim to the BIA for reconsideration in light of the fact that the IJ took judicial notice of, and relied upon, the Country Report.

**Petition GRANTED in part, DISMISSED in part, and DENIED in part.**

Each party shall bear its own costs and fees.

---

VANDYKE, Circuit Judge, dissenting:

The majority's lawless remand of this case to the BIA flouts binding precedent stating that the BIA is *not* required to consider—nor are we permitted "to take judicial notice of"—a country report that is "not part of the administrative record or not previously submitted to the Board." *Fisher v. INS*, 79 F.3d 955, 963 (9th Cir. 1996) (en banc).[1]  But

---

[1] I recognize that "lawless" is a strong word, and I don't use it lightly.  But it is sadly appropriate here.  The majority not only fails to cite *any* relevant precedent for its remand to the BIA—thus evincing that its remand is, precisely, "not regulated by or based on law," *Lawless*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/lawless (last visited Feb. 25, 2021)—it even has the cheek to

notwithstanding contrary on-point, *en banc* authority, I guess nobody can make intransigent judges unknow what they already know they know—in this case the majority's passing reference to the "pervasive criminality within Honduran society."[2] I cannot join the majority's opinion and must respectfully dissent.

It must be challenging for the BIA to know how to proceed in cases our court will review. Even when the BIA acts in accordance with our clear *en banc* precedent, we sometimes simply ignore that authority, identify some new vague esoteric error in the BIA's decisionmaking, and add yet another non-intuitive exaction to the already byzantine tangle of standards and procedures we've heaped upon the agency. We make it very difficult, if not impossible, for the BIA to properly do the job Congress gave it.

The BIA did not err in this case. It acted in accordance with our precedents. Nevertheless, our court once again remands without clear direction or even a clear description of what the BIA apparently did wrong. The Real ID Act tells

---

cite *Fisher*, which actually *forecloses* its remand rationale, in the part of its opinion ordering the remand. "Keep your enemies close …," as they say.

[2] Members of our court have not hesitated to criticize former President Trump for his unjustified negative depictions of some countries south of the border. *See, e.g.*, *Ramos v. Wolf*, 975 F.3d 872, 925 n.13 (9th Cir. 2020) (Christen, J., dissenting); *cf. Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 518–20 (9th Cir. 2018), *cert. granted*, 139 S. Ct. 2779 (2019), *rev'd in part, vacated in part*, 140 S. Ct. 1891, 1915–16 (2020). So it is particularly rich that the majority here is remanding this case based on nothing more than Aguilar-Osorio's unsupported claims of "pervasive criminality within Honduran society," which the majority acknowledges it shouldn't judicially notice under *Fisher*.

us all we need to know about our "extremely deferential" review of the agency's findings, *Farah v. Ashcroft*, 348 F.3d 1153, 1156 (9th Cir. 2003), but that statute is curiously silent about unelected judges' personal geopolitical intuitions. Our precedent dictates the correct outcome in this case. We should have denied the petition in full.

## I.

The 2016 Honduras Country Report (Country Report)[3] is not in the administrative record in this case because Aguilar-Osorio's counsel failed to submit it in compliance with the practice manual, and then failed to ever request that the IJ or the BIA add it to the administrative record. Sure, the IJ noticed the Country Report in its *withholding analysis* to establish that Honduras has a high rate of general criminality. But *Fisher* makes clear that neither the IJ nor the BIA were then required to use it in other portions of their analysis when the report isn't in the record. 79 F.3d at 963–64 (determining that a country report was not properly before the BIA where the IJ relied on a portion of it for the IJ's decision, but the petitioner never submitted it to the IJ nor requested that the IJ or BIA take administrative notice of it and add it to the administrative record). *See also Madrigal v. Holder*, 716 F.3d 499, 509 (9th Cir. 2013) (remanding where the BIA "did not consider all the country condition evidence [petitioner] *properly placed before it*" (emphasis added)). Presumably it was this—our well-settled law on the topic—that fooled the BIA into failing to mention a country

---

[3] *See generally* U.S. Dep't of State, 2016 Country Reports on Human Rights Practices: Honduras, https://www.justice.gov/sites/default/files/pages/attachments/2017/03/06/dos-hrr_2016_honduras.pdf. I provide this link because the Country Report obviously cannot be cited to as part of the record.

report that was never "properly placed before it." *Id.* The majority acknowledges the Country Report "is not a part of the record." But apparently, if it's Honduras, that doesn't matter.

The majority also observes that Aguilar-Osorio relied upon the Country Report in his briefing to the BIA. But it fails to explain why that is relevant. Aguilar-Osorio never once asked either the IJ or the BIA to add the Country Report *to the record*. We see litigants *unsuccessfully* attempt to sneak non-record evidence into their briefing all the time. But the BIA may not engage in de novo fact finding, 8 C.F.R. § 1003.1(d)(3)(i), and our review is limited to "the administrative record on which the order of removal is based." 8 U.S.C. § 1252(b)(4)(A). Aguilar-Osorio could have asked to add the Country Report to the record. He did not. So under settled law, the IJ was under no obligation to consider the Country Report in contexts beyond that in which the IJ noticed it (withholding, not CAT relief), and the BIA couldn't have erred by failing to mention a country report that wasn't in the record on appeal. *See Fisher*, 79 F.3d at 963–64.

There is no legal basis to grant this petition, as evidenced by the fact that the majority cites no authority for doing so. Frankly, I'm not even sure what the BIA is supposed to do on remand—an uncertainty the BIA will undoubtedly share. The majority ambiguously remands the case to the BIA "for reconsideration *in light of the fact* that the IJ took judicial notice of, and relied upon, the Country Report" in addressing Aguilar-Osorio's *different* claim. Notice that the majority doesn't order the BIA to actually consider the Country Report—because, under *Fisher*, it can't. Because, again, *the Country Report is not in the record*. Apparently the majority hopes that on remand, Aguilar-Osorio will now (finally!)

request that the Country Report be added to the record; *and* the BIA will remand the case back to an IJ; *and* the IJ will grant Aguilar-Osorio's *very untimely* request to add the Country Report (which it has no obligation to do); *and* the Country Report evidence is so definitive it could make some difference in the BIA's decision. All because the BIA "has not addressed" something *Fisher* makes abundantly clear it had no obligation to address.

## II.

Even assuming arguendo that most of the majority's hopeful chain was based on something more than a pile of dreams, its last assumption is particularly doubtful. Here, the agency's denial of Aguilar-Osorio's CAT claim was based on *case-specific* evidence. It's strange to think that *generalized* evidence from a country report could override all the individual facts specific to Aguilar-Osorio's situation that undergirded the agency's decision. Indeed, it's beyond strange—it's contrary to our circuit's well-established precedent. *See, e.g.*, *Santos-Ponce v. Wilkinson*, No. 18-72433, 2021 WL 481174, at *4 (9th Cir. Feb. 10, 2021) (concluding, in a case where the Country Report *was* in the record, that petitioner's individualized evidence of risk of harm, "combined with the existence of generalized violence in Honduras, does not compel the conclusion that, upon his return to Honduras, [petitioner] would more likely than not experience torture" (*citing Delgado-Ortiz v. Holder*, 600 F.3d 1148, 1152 (9th Cir. 2010) (per curiam) ("Petitioners' generalized evidence of violence and crime in Mexico is not particular to Petitioners and is insufficient to meet [the CAT] standard."))).

The specific record evidence establishes that Aguilar-Osorio was present at a 2005 robbery where the perpetrators were never identified as gang members. The police arrived

on the scene to investigate and take witness statements, but Aguilar-Osorio refused even to talk to them.  He claims to have soon thereafter received an anonymous letter warning him not to talk to the police about the robbery.  He never did—about the robbery or the anonymous letter.  He also testified (admitting that he was speculating and that he lacked any personal knowledge of these facts) that two other witnesses to the robbery, who allegedly also received identical threat letters, were later killed by the anonymous correspondents (in one instance, seven years after the robbery).[4]  Additionally, while he claimed the anonymous letter demanded monthly extortion payments, it didn't indicate how or who to pay.  Finally, there is no evidence that the robbers or gang members (or anyone else) have been searching for Aguilar-Osorio or ever visited his family's home (where the anonymous letter was delivered).

Given all this *specific record* evidence, the IJ reasonably concluded "that the evidence presented is insufficient to show that it is more likely than not that respondent will be tortured if he returns to Honduras."  *See Go v. Holder*, 640 F.3d 1047, 1054 (9th Cir. 2011) (concluding substantial evidence supported the BIA's conclusion that petitioner wasn't likely to be tortured upon removal, despite his credible-fear testimony and the country reports' "generalized evidence suggesting a relatively high level of mistreatment and abuse" and government corruption); *see also Lopez-Cardona v. Holder*, 662 F.3d 1110, 1114 (9th Cir. 2011) (rejecting CAT claim where petitioner's fear was

---

[4] The BIA was silent as to the IJ's finding that the evidence was insufficient to show the two fellow witnesses were killed for failure to pay the extortion money.  Such silence leads to only one reasonable conclusion: that the BIA didn't think the finding was clearly erroneous. *See* 8 C.F.R. § 1003.1(d)(3)(i).

based on one 2005 El Salvadoran gang beating, where there was no evidence that the gang knew petitioner or had any reason other than general criminality to beat him, and where the beating stopped when police arrived).  Even if the Country Report were properly in the record (it isn't) and painted an uncontroverted picture of routine and unchecked torture (it doesn't), this *generalized* evidence would need to be weighed alongside the other *specific* record evidence in this case.  The evidence—considered as a whole—could not compel us to reach a result different from the agency's, because there is already substantial evidence in the record supporting the agency's conclusion.  *See INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).

## III.

Finally, the Country Report does not provide uncontroverted evidence that Aguilar-Osorio is likely to be tortured if he is returned to Honduras.  If anything, the picture painted by the report is quite mixed and contains affirmative evidence that the police and other authorities have been taking action to rein in violence and torture in that country.

I acknowledge, as did the IJ (in its withholding analysis), that the Country Report shows a very serious, persistent problem of criminality, perpetuated by organized crime, gangs, and some corrupt official forces, as of 2016.  But there is lots of other evidence in the Country Report showing the significant strides taken by the Honduran government to address those problems.  For instance, the authorities arrested and detained one of their own Honduran National Police officers suspected of torturing detainees.  And as far as official corruption, the Honduran government created a "Special Commission in Charge of Purging and Restructuring the Honduran National Police," which was

tasked with reviewing the performance and integrity of all police officials. As of the following December, the Commission had reviewed 3,004 officials' personnel files and dismissed a total of *2,091* officers.

Moreover, "[o]n May 27, the UN special rapporteur on extrajudicial, summary, or arbitrary executions recognized that *the government had taken steps to reduce the homicide rate*, but urged authorities to do more to protect the right to life and reduce violence." (Emphasis added.) "According to the UNAH Violence Observatory, there was no significant change in the overall annual homicide rate in the first six months of [2016] … *after several years of steep decline*." (Emphasis added.) Notably, these years of steep decline coincided with Aguilar-Osorio's time in the U.S. The Country Report in one sentence mentions that "[t]here were reports that criminal gangs tortured individuals," but the Country Report otherwise focuses entirely on torture perpetrated by official forces, noting that as of October 2016, "[t]he Public Ministry had 49 active torture cases against members of police and military."

Aguilar-Osorio admitted he doesn't know if the robbers were gang members, he expressed no fear about being tortured by the government, and he never reported any of his troubles to the police, who appear willing and able to protect him. Even if the Country Report were properly in the record, it wouldn't support the majority's apparent assumption that Aguilar-Osorio likely faces torture if removed … because … it's Honduras.

I find no basis in the law or the record—or even *outside* the record, since the majority can't resist—to grant this petition. I therefore respectfully dissent.